IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| MARY KUUIPO PURDY, | CV. NO. 17-00071 DKW-KSC |
| Plaintiff, | |
| vs. | **ORDER AFFIRMING DECISION OF ADMINISTRATIVE LAW JUDGE** |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security, | |
| Defendant. | |

## <u>INTRODUCTION</u>

Plaintiff Mary Kuʻuipo Purdy brings this action under 42 U.S.C. § 405(g),

challenging a final decision of the Acting Commissioner of Social Security, Nancy

A. Berryhill, which denied her application for disability insurance benefits and

supplemental security income based upon a finding that she was not disabled.

Purdy asks this Court to review whether the Administrative Law Judge ("ALJ")

properly weighed the medical opinions of the treating, examining, and

non-examining physicians in determining impairments, as part of her assessment of

Purdy's residual functional capacity.   After carefully reviewing the record, the

Court concludes that the ALJ correctly determined that Purdy was not disabled at

Steps 4 and 5 of the five-step sequential evaluation process.   The ALJ considered,

weighed, and addressed all of the medical source opinions in the record and provided appropriate reasons supporting her findings and resolving the conflicting opinions and medical evidence. Because the ALJ's decision was supported by substantial evidence and was not legally erroneous, the Court affirms the ALJ's July 20, 2015 decision.

## BACKGROUND

### I.    Factual Background

Purdy filed applications for disability insurance benefits and supplemental security income on August 8, 2013. Admin. R. ("AR") 164–72. Purdy last worked as an area supervisor for a gas station and alleged disability from October 30, 2010, due to neuropathy and numbness in her feet, diabetes, depression, sciatic nerve damage, back injury, and chronic kidney failure. AR 187–89. Her claims were denied twice—once on January 22, 2014 and again upon reconsideration on May 12, 2014. AR 51–52, 75–76, 109–12, 114–119. On June 18, 2014, Plaintiff filed a request for a hearing. AR 120. ALJ Nancy Lisewski conducted the hearing on June 11, 2015, at which Purdy and Vocational Expert ("VE") Alice L. Thomas testified. AR 35–60 (6/11/15 Hrg. Tr.). In her July 20, 2015 decision, the ALJ employed the five-step sequential disability evaluation process to determine whether

Purdy was disabled within the meaning of the Social Security Act. *See* 20 C.F.R. § 404.1520(a)(4).[1]

The ALJ found that Plaintiff had the following severe impairments: diabetes type II, neuropathy, chronic back pain, hypertension, status post knee surgery, obesity, and chronic kidney disease. AR 23–24. The ALJ ultimately determined that Purdy had "the residual functional capacity to perform light work" and "was capable of performing past relevant work" as an area supervisor, or alternatively that she "is also capable of making a successful adjustment to other work." AR 28–29.

---

[1] The claimant has the burden of proof for Steps 1 through 4, and the Commissioner has the burden of proof at Step 5. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). The five steps of the inquiry are:

> 1. Is claimant presently working in a substantially gainful activity? If so, then the claimant is not disabled within the meaning of the Social Security Act. If not, proceed to Step 2. 20 C.F.R. §§ 404.1520(b), 416.920(b).
>
> 2. Is the claimant's impairment severe? If so, proceed to Step 3. If not, then claimant is not disabled. 20 C.F.R. §§ 404.1520(c), 416.920(c).
>
> 3. Does the impairment "meet or equal" one of a list of specific impairments described in 20 C.F.R. Part 220, Appendix 1? If so, then the claimant is disabled. If not, proceed to Step 4. 20 C.F.R. §§ 404.1520(d), 416.920(d).
>
> 4. Is the claimant able to do any work that he or she has done in the past? If so, then the claimant is not disabled. If not, proceed to Step 5. 20 C.F.R. §§ 404.1520(e), 416.920(e).
>
> 5. Is the claimant able to do any other work? If so, then the claimant is not disabled. If not, then the claimant is disabled. 20 C.F.R. §§ 404.1520(f), 416.920(f).

*See Bustamante v. Massanari*, 262 F.3d 949, 954 (9th Cir. 2001).

Consequently, she concluded that Purdy was "not disabled" under Sections 216(i), 223(d), or 1614(a)(3)(A) of the Social Security Act.   AR 29.

Purdy disputes the findings relating to her impairments and the subsequent residual functional capacity ("RFC") finding that her limitations (resulting from those severe impairments) were not extensive enough to qualify her for benefits. Thus, the Court first discusses the evidence relevant to the RFC finding, and then turns to the RFC finding itself.

## A.   The Medical Evidence Before the ALJ

The ALJ considered medical source opinions from Purdy's treating physicians, a consultative psychological examiner, and several non-treating physicians, in addition to Purdy's medical records.

### 1.   Treating Physicians Heslinga And Horn

Purdy began seeing Dan Heslinga, M.D. in January 2011.   AR 867.   Dr. Heslinga completed a Residual Functional Capacity Questionnaire and a Mental Capacity Assessment, AR 867–74, opining that Purdy's symptoms—"hand cramps and pain, pain in both feet, low back pain, fatigue"—were "frequently" severe enough to interfere with the attention and concentration required to perform simple work-related tasks.   AR 867.   He checked boxes indicating that Purdy would need a job which permits "shifting positions at will from sitting, standing, or walking," and that she would "need to take unscheduled breaks during an 8-hour work day"

and "15 min[ute] breaks . . . every hour."   AR 867.   Dr. Heslinga also checked

boxes to indicate that Purdy: (1) can occasionally lift and carry ten pounds or less;

(2) cannot lift or carry 20 pounds or more; (3) has limitations in doing repetitive

reaching, handling or fingering; (4) could stand and walk only two hours per day and

45 minutes at one time, and sit for six hours per day and 45 minutes at a time; and

(5) is not physically capable of working an eight-hour day, five days a week, on a

sustained basis.   AR 867–68.   He also checked a box indicating that Purdy was

likely to be absent from work more than four times a month as a result of her

impairments or treatments.   AR 868.

The mental capacity evaluation completed by Dr. Heslinga noted "moderate"

limitations in handling detailed instructions, performing activities within a schedule,

and sustaining an ordinary routine without special supervision.   AR 871.   He

checked off "marked" limitations in completing a "normal workday" and "normal

workweek," and ability to perform at a consistent pace with a standard number and

length of rest periods, and selected the box indicating that Purdy would likely have

four or more absences per month.   AR 872.   Dr. Heslinga checked "moderate"

limitations in accepting instructions and responding appropriately to criticism and

getting along with coworkers, AR 872, and "marked" limitations in traveling to

unfamiliar places.   AR 873.   He indicated that Purdy can manage benefits in her

own best interest.   AR 873.

Purdy's treating psychologist, Mary Horn, Psy.D. completed a Report of Treating Mental Health Provider, dated February 2014, indicating a diagnosis of "major depressive disorder, moderate to severe."   AR 679.   Dr. Horn's responses to the functional analysis questions opined that Purdy would "not regularly" be able to maintain "regular job attendance and persist[] at repetitive work tasks on a consistent basis under ordinary supervision."   AR 681.   She responded "not sure" to the question: "Is the patient capable of adapting/coping with a low-demand, entry-level job?"   AR 682.   She opined that Purdy could manage any benefits. AR 682.   Dr. Horn noted that Purdy's visits and treatment were sporadic.   AR 679.

Dr. Horn completed a second Report of Treating Mental Health Provider, dated March 28, 2014, again reporting Purdy's history of depression, "trauma, [and] stressful life events."   AR 684.   She reported Purdy's cognitive status as "normal," affective status as "depressed," noted that her compliance with treatment was "sporadic" and that her response to treatment was "good when she is able to come." AR 685.   In response to the question, "Is the patient capable of maintaining regular job attendance and persisting at simple repetitive work tasks on a consistent basis under ordinary supervision," Dr. Horn answered, "no."   AR 686.   On this second report, Dr. Horn responded "yes" to the question: "Is the patient capable of adapting/coping with a low-demand, entry-level job?"   AR 687.

## 2.    Examining Psychologist Luke

On January 4, 2014, Stanley Luke, Ph.D. conducted an examination for the State of Hawaii Department of Human Services ("State Agency").   AR 516–19. As consultative psychological examiner, Dr. Luke diagnosed Purdy with depression and generalized anxiety disorder.   Purdy self-reported a history of depression, grief, and anxiety, and indicated that she had been seeing Dr. Horn in the past and desired to restart sessions.   AR 516–17.   Purdy reported that Dr. Heslinga prescribed Wellbutrin and Alprazolam for her depression and anxiety, and she complained of panic attacks and poor sleep.   AR 516.   She told Dr. Luke that she had been admitted to the emergency room frequently due to chronic kidney problems and related medical conditions.   AR 516.   Purdy explained that she last worked in 2010, managing five gas stations, and was currently homeschooling her seven year old son.   AR 516.

Dr. Luke conducted several assessments.   IQ testing showed that Purdy had a full-scale IQ of 89, verbal IQ of 93, and performance IQ of 87.   AR 516–17.   Dr. Luke opined that Plaintiff was depressed, but readily engaged during the interview, and put forth good effort on testing, although she "struggled with her stress and anxiety."   AR 517.   Dr. Luke observed that Purdy was polite and cooperative, and able to complete all tasks, but presented as sad and anxious, distressed about an

inability to work, worried about finances, and depressed due to the death of her mother.   AR 517.

With respect to her functional assessment, Dr. Luke noted Purdy's report that she was able to do her own chores, hygiene, and cook without assistance, homeschool her son, and enjoy interests, including watching TV, the outdoors, walking, swimming, and family activities.   AR 518.   Dr. Luke opined that Plaintiff could understand and remember simple work instructions; maintain regular job attendance and perform a simple work routine on a sustained basis under ordinary supervision; get along with supervisors and coworkers; and was able to adapt and cope with the usual demands of a low-stress job.   AR 518.   He observed that she "likely could benefit from psychotherapy and dealing with grief and other issues. . . . Many of her difficulties appear to be medical in nature."   AR 518.   Dr. Luke also opined that Purdy seemed capable of managing her own benefits and finances.   AR 518.

### 3.    Non-Examining Physicians Fujikami and Shibuya, and Non-Examining Psychologists Lam and Fo

The State Agency medical consultants, Raymond Fujikami, M.D. and D. Lam, Ph.D., conducted an RFC assessment by reviewing Purdy's medical records. On January 22, 2014, Dr. Fujikami determined that Purdy had a "light" RFC, specifically finding that she could: (1) occasionally lift and carry 20 pounds;

(2) frequently lift and carry 10 pounds; (3) stand and walk for six hours in an eight-hour workday; and (4) sit for six hours in an eight-hour workday.   AR 59–61. He opined that she could occasionally climb ladders, ropes, and scaffolds, and perform other postural activities frequently; but should avoid concentrated exposure to hazards and machinery due to polyneuropathy in her feet.   AR 60–61.   Dr. Fujikami noted that although Purdy had neuropathy in her feet, she showed a normal gait during all examinations.   AR 61.

State agency psychologist D. Lam, Ph.D. also reviewed Purdy's historical medical records and Dr. Luke's report from the January 4, 2014 consultative examination.   AR 56–58.   Dr. Lam opined that Purdy would have "mild" restrictions in activities of daily living, and "mild" difficulties in social functioning and concentration, persistence, or pace.   AR 57.   Dr. Lam noted that Plaintiff had no treatment for many months, but continued to get prescriptions from her primary care provider (Dr. Heslinga), homeschooled her son, socialized with friends, went on family outings, exercised regularly, and cooked and cleaned without assistance. AR 58.   Dr. Lam noted that Dr. Luke's examination showed adequate appearance, good effort on testing, good eye contact, that Purdy was sad and anxious, but her activities of daily living ("ADLs") were "generally intact mentally," and she showed no significant concentration impairment.   AR 58.   Dr. Lam agreed with a "non-severe" finding with respect to her mental impairments, AR 56, and

determined that her "[l]imitations are primarily physical." AR 58. Purdy's initial claims were accordingly denied on January 22, 2014. AR 51–52.

Upon Purdy's request for reconsideration, State Agency medical consultants Neil Shibuya, M.D. and W. Fo, Ph.D. reviewed the prior assessment and Purdy's medical records. AR 75–106. They considered additional evidence, including Purdy's January 2014 hospitalizations for complications due to chronic kidney issues, her reports of worsening right-side neuropathy, and additional lab results. AR 83. On May 8, 2014, Dr. Shibuya conducted another RFC assessment, and came to the same conclusion as Dr. Fujikami, with some additional restrictions. Dr. Shibuya opined that Plaintiff could lift and carry up to 20 pounds occasionally and 10 pounds frequently; stand and walk six hours and sit six hours per day; and perform postural activities occasionally. AR 87–88. Dr. Shibuya affirmed the prior RFC of "light work," concluding that the earlier determination regarding physical impairment was "substantively and technically correct given the objective findings." AR 83.

State Agency psychologist W. Fo, Ph.D. reviewed Purdy's records in May 2014 and assigned "great weight" to Dr. Luke's report, noting that Dr. Luke's opinion was supported by objective tests and clinical findings. AR 83. Dr. Fo observed that Dr. Horn's "somewhat more restrictive opinion of current work capacity" was not consistent with the "clinical and lay source evidence and is from a

source that may not be entirely objective," and accordingly, Dr. Fo did not afford it

"much weight."   AR 83–84.   He noted that, at the reconsideration phase, Purdy did

not report any worsening of her mental impairment and the updated medical

evidence did not reveal other significant changes, nor did Purdy report any

worsening in her "conditions or limits on a mental basis."   AR 85.   Dr. Fo affirmed

that Purdy would have "mild" restrictions in activities of daily living, and "mild"

difficulties in social functioning and concentration, persistence, or pace, and

likewise affirmed the prior finding of non-severe mental impairment.   AR 84–85.

### B.      The ALJ's RFC Finding

In her July 20, 2015 decision, the ALJ considered and weighed the medical

evidence and concluded that although Purdy has a non-severe adjustment disorder

with mild restrictions and difficulties based upon the assessments of the State

Agency medical consultants, the limitations are no more than "mild," and Purdy

does not have a severe mental impairment.   AR 24.   The ALJ afforded substantial

weight to the opinions of the State Agency medical consultants "because they are

consistent with the medical evidence."   AR 24.   The ALJ explained that she did not

give as much weight to the opinions of Dr. Horn, including that Purdy had

significant mental functional limitations, because "they are not supported by the

treatment record."   AR 24.   Likewise, the ALJ did not give any weight to Dr.

Heslinga's mental functional assessment because he is not a mental health specialist

and because although he recommended psychotherapy, there was no evidence of regular formal mental health treatment such as counseling. AR 24. Overall, reviewing Purdy's primary care progress notes, the ALJ found that "Dr. Heslinga's mental medical source statement is not supported by the treatment record." AR 25.

Considering Purdy's symptoms, their limiting effects, and the credibility of statements regarding the same in light of the objective medical evidence, the ALJ found that Purdy had the residual functional capacity to perform light work, except that she can only occasionally operate foot controls, climb, kneel, crouch, crawl, stoop, and balance. AR 25. The ALJ did not fully credit Purdy's testimony regarding her physical symptoms in light of the evidence that she was homeschooling her son, she "walked daily and swam regularly," and her admissions that "she had few problems performing personal care activities, she was able to perform household chores, and she could grocery shop," all of which led the ALJ to conclude that Purdy's "activities of daily living are not consistent with her allegations of disabling pain and symptoms, and her activities of daily living do not justify a more restrictive residual functional capacity (such as a limitation to sedentary work)." AR 26.[2]

_____

[2]The ALJ also relied upon Dr. Horn's notes indicating that Purdy reported being terminated from her job at the gas station for cause, "an inconsistency that lessens her credibility. The evidence [also] indicates that the claimant had skipped sessions and was not ta[]king as much of her medication because she felt like she did not need them, including being irregular with insulin *(e.g.,*

In determining Purdy's RFC, the ALJ gave greater weight to the medical opinions of the non-treating physicians, rather than to those of Dr. Heslinga and Dr. Horn.   AR 23–26.   She found the RFC assessment conducted upon reconsideration by Dr. Shibuya and Dr. Fo compelling, acknowledging that although it was based "on nonexamining relationships, [it nevertheless was entitled to greater weight] because [it] adequately consider[ed] the claimant's subjective complaints, and [is] consistent with the treatment record."   AR 26.

At Step 4, the ALJ found Purdy "not disabled" because she can perform some of her past relevant work as an Area Supervisor.   AR 28.   Based on the ALJ's RFC determination, the ALJ concluded at Step Five that Plaintiff is not disabled because there were jobs that existed in significant numbers in the national economy that she could perform.   AR 28.   Alternatively, even if Purdy had been "limited to simple, routine work (assuming her adjustment disorder is severe and justifies [such] mental functional limitations) and thus could not perform her skilled past relevant work at Step Four," the ALJ found that "there are a significant number of other jobs existing in the national economy at the unskilled level that she would also be able to perform (rendering her also 'not disabled' at Step Five)."   AR 28.   The ALJ then accepted the VE's uncontradicted testimony that Purdy is capable of making a successful

Exhibits 2F/102; 21F), but this treatment non-compliance lessens her credibility as well."   AR 26. *See also* AR 883 (2/7/12 Dr. Horn Intake Form).   Purdy does not challenge the ALJ's credibility determinations on appeal.

adjustment to other work that exists in significant numbers in the national economy, including photocopy machine operator, cleaner and/or housekeeper, or operator for a power screw driver.   AR 28–29.   In light of these findings, the ALJ concluded that Purdy has "not been under a disability" from October 30, 2010 through the date of the decision.   AR 29.

## II.   <u>Procedural Background</u>

The Appeals Council rejected Purdy's request to review the July 20, 2015 ALJ decision, which became the final decision of the Commissioner on December 14, 2016.   AR 1–6.

On February 17, 2017, Purdy filed her Complaint seeking judicial review of the decision.   Compl., Dkt. No. 1.   On appeal, Purdy contends that the ALJ's RFC finding was the product of legal error and was unsupported by substantial evidence because she failed to credit the medical opinions of the treating medical providers Heslinga and Horn or to include appropriate mental limitations in determining the RFC.   Purdy asks the Court to reverse the final decision of the ALJ that she is not disabled and remand for payment of benefits or for a new administrative hearing. *See* Opening Br. at 27.

## <u>STANDARD OF REVIEW</u>

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Social Security Act.   *See* 42

U.S.C. § 405(g).[3]   In reviewing findings of fact with respect to such determinations, the court must uphold the Commissioner's decision, made through an ALJ, "unless it is based on legal error or is not supported by substantial evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).   "Substantial evidence is more than a mere scintilla but less than a preponderance." *Id.* (quoting *Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005)).   Stated differently, "[s]ubstantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) (citing *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989)) (quotation marks omitted).   "Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld." *Id.* at 679; *see also Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014) ("[Courts] leave it to the ALJ to determine credibility, resolve conflicts in the testimony, and resolve ambiguities in the record.") (citations omitted).

Finally, the Court may not reverse an ALJ's decision on account of an error that is harmless.   *See Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055–56 (9th Cir. 2006).   "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Molina v. Astrue*, 674 F.3d

---

[3] 42 U.S.C. § 1383(c)(3) incorporates the judicial review standards of 42 U.S.C. § 405(g), making them applicable to claims for supplemental security income.   *See Flynn v. Berryhill*, 2018 WL 379012, at *1 n.2 (D. Haw. Jan. 11, 2018).

1104, 1111 (9th Cir. 2012) (citation omitted).   In making this assessment, the Court

"look[s] at the record as a whole to determine whether the error alters the outcome of

the case."   *Id*. at 1115.   And "the more serious the ALJ's error, the more difficult it

should be to show the error was harmless."   *Marsh v. Colvin*, 792 F.3d 1170, 1173

(9th Cir. 2015).   This rule reflects how "[the Ninth Circuit's] precedents have been

cautious about when harmless error should be found."   *Id.*

## DISCUSSION

The Social Security Act authorizes payment of Title II disability insurance

benefits and Title XVI supplemental security income to individuals who have an

"inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death

or which has lasted or can be expected to last for a continuous period of not less than

12 months."   42 U.S.C. § 423(d)(1)(A) (Title II disability insurance benefits);

*accord* § 1382c(a)(3)(A) (Title XVI supplemental security income).   An individual

is disabled only if her impairments are of such severity that she is unable to do her

previous work, and cannot, considering her age, education, and work experience,

engage in any other substantial gainful activity existing in the national economy.

*See, e.g., id.* § 423(d)(2)(A).

Purdy raises the following issues on appeal: (1) the ALJ failed to properly

weigh and evaluate the opinions of treating physicians Dr. Heslinga and Dr. Horn;

and (2) the ALJ failed to properly consider her severe and/or non-severe mental

limitations in the RFC.   The Court addresses each issue below, and finding no error,

affirms the ALJ's decision.

## I.    The ALJ Appropriately Evaluated The Medical Opinion Evidence

Purdy contends that the ALJ's RFC determination was erroneous because it

did not properly weigh and evaluate the medical opinions of her treating providers.

The ALJ gave greater weight to the medical opinions of the examining and

non-treating physicians, rather than to those of Dr. Heslinga and Dr. Horn,

explaining, in part, that:

> Initially, the State Agency medical consultants concluded that the claimant could perform light work with generally frequent postural limitations (Exhibits 3A; 4A).   I give some weight, but not great weight, to these physical residual functional capacity assessments, however, because they are not based on the most recent medical evidence and do not adequately consider the claimant's subjective complaints.
>
> Upon reconsideration, however, the State Agency medical consultants again concluded that the claimant could perform light work, but this time with only occasional postural limitations as well as limited pushing and/or pulling in the lower extremities - i.e., use of foot controls (Exhibits 7A; 8A).   I give great weight to these physical residual functional capacity assessments, even though they are based on nonexamining relationships, because they adequately consider the claimant's subjective complaints, and they are consistent with the treatment record.

AR 26.   The ALJ gave less weight to the opinions of Dr. Heslinga and Dr. Horn,

principally because their opinions were not supported by their own progress notes or

other objective medical evidence:

> Treating source Dr. Heslinga stated on March 20, 2014 that the claimant would need unscheduled breaks, she would not be able to stand and/or walk more than 2 hours total in an 8-hour workday with a sit/stand option, she would not be able to frequently lift even less than 10 pounds, and she would not be physically capable of working an 8 hour day, 5 days a week on a sustained basis (Exhibit 17F), which is akin to less-than-sedentary work.   The progress notes do not, however, support this degree of functional limitation.

> \*\*\*\*

> Some of the treating source assessments seem like advocacy, rather than supported by the treatment notes.   For example, Dr. Horn's aforementioned mental medical source statements (Exhibits 6F; 7F; 20F) are not supported by the treatment notes. As discussed above, Dr. Heslinga gave both disabling mental and physical limitations (Exhibits 17F; 18F).   The claimant has not had very frequent treatment, which is another indication that her functional limitations are not as significant as alleged.   The medical evidence does not establish greater functional limitations beyond those adopted above for any 12-consecutive month period (e.g., Exhibits 11 F/4; 14F).

> In sum, I find that the objective medical evidence and the subjective evidence support the residual functional capacity adopted above.

AR 26–27.   As explained below, the Court finds no error in the ALJ's weighing and

evaluation of the medical source opinions.

## A.     Legal Principles For Weighing Medical Opinions

The Ninth Circuit has established a hierarchy for weighing medical opinions and resolving conflicts.   Generally, "[t]here are three types of medical opinions in social security cases: those from treating physicians, examining physicians, and non-examining physicians." *Valentine v. Comm'r of Soc. Sec. Admin*., 574 F.3d 685, 692 (9th Cir. 2009).   When assessing medical opinions, "the opinion of a treating physician must be given more weight than the opinion of an examining physician, and the opinion of an examining physician must be afforded more weight than the opinion of a reviewing physician." *Ghanim v. Colvin*, 763 F.3d 1154, 1160 (9th Cir. 2014).

In cases such as this, "[w]here a treating or examining physician's opinion is contradicted by another doctor, the 'Commissioner must determine credibility and resolve the conflict.'" *Valentine*, 574 F.3d at 692 (quoting *Thomas v. Barnhart*, 278 F.3d 947, 956–57 (9th Cir. 2002)).   When rejecting "a treating or examining doctor's opinion [that] is contradicted by another doctor's opinion," an ALJ must provide "specific and legitimate reasons that are supported by substantial evidence." *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005); *see also Burrell v. Colvin*, 775 F.3d 1133, 1137 (9th Cir. 2014).

When resolving this conflict, "the contrary opinion of a non-examining medical expert does not alone constitute a specific, legitimate reason for rejecting a

treating or examining physician's opinion." *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001). A contrary opinion can, however, "constitute substantial evidence when it is consistent with other independent evidence in the record." *Id*.; *see also Thomas*, 278 F.3d at 957 ("The opinions of non-treating or non-examining physicians may also serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record.").

An ALJ can meet this burden "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating [the ALJ's] interpretation thereof, and making findings." *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) (finding specific and legitimate reasons for rejecting treating physician's opinion where the ALJ stated that the assessment largely reflected the claimant's self-reported pain, which the ALJ found was not credible). "[A]n ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion." *Garrison v. Colvin*, 759 F.3d 995, 1012–13 (9th Cir. 2014) (affirming that ALJ failed to offer specific and legitimate reasons where he largely ignored medical treatment and opinion evidence).

With this framework, the Court turns to the ALJ's weighing of the conflicting medical source opinions and concludes that the ALJ's reasons for discounting

Purdy's treating physicians' opinions were "specific and legitimate" and are supported by substantial evidence in the record.

## B.     The ALJ Properly Considered Dr. Heslinga's Opinion

The ALJ found that the opinion of treating physician Dr. Heslinga and, in particular, his mental functional assessment, was not supported by the objective medical evidence.   The ALJ instead afforded "great weight" to Dr. Shibuya's physical RFC assessment and to the opinion of Dr. Luke, the consultative examining psychologist.   Because the opinions of the State Agency medical consultants relied upon by the ALJ were consistent with independent clinical evidence and the ALJ's own observations, it was not error to afford greater weight to the examining and non-examining medical provider opinions rather than to Dr. Heslinga's opinion. Each of the opinions relied upon by the ALJ constituted substantial evidence, which was consistent with the record, and which therefore justified assigning significant weight to their conclusions.   *See Thomas*, 278 F.3d at ("[t]he opinions of non-treating or non-examining physicians may also serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record"); *Tonapetyan*, 242 F.3d at 1149 (9th Cir. 2001) (examining source's opinion may constitute substantial evidence where based upon independent examination of claimant).

Dr. Heslinga's physical RFC assessment was a check-the-box form, which the

ALJ considered and found was not supported by the independent clinical record,

including Dr. Heslinga's own progress notes.   AR 26–27.   The ALJ therefore did

not err by affording less weight to Heslinga's opinions, given that they were "brief,

conclusory, and inadequately supported by clinical findings."   *Thomas*, 278 F.3d at

957; *see also Crane v. Shalala*, 76 F.3d 251, 253 (9th Cir. 1996) (ALJ permissibly

rejected psychological evaluations "because they were check-off reports that did not

contain any explanation of the bases of their conclusions"); *De Guzman v. Astrue*,

343 F. App'x 201, 209 (9th Cir. 2009) (ALJ was "free to reject" doctor's check-off

report that did not explain basis for conclusions); *Hernandez v. Colvin*, 2014 WL

1800408, at *9–10 (C.D. Cal. May 6, 2014) (ALJ reasonably accorded little weight

to medical examiner's RFC where "assessments were brief and conclusory,

consisting merely of checkmarks and brief responses, with no clinical or diagnostic

evidence noted to support her findings."); *see also Bray v. Comm'r of Soc. Sec.

Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009) (rejecting a medical opinion that is

inconsistent with clinical findings).

The ALJ, for instance, thoroughly reviewed Purdy's medical history and

found, in part, as follows with respect to Dr. Heslinga's recommendations:

> Diet and exercise were suggested (*e.g.*, Exhibits 2F/23; 8F/10;
> 15F/3), which is conservative treatment (as opposed to kidney
> dialysis or a kidney transplant) that indicates that the claimant's

kidney impairment was not as significant as alleged. Further, an examination indicated that the claimant had no diabetic retinopathy (Exhibit 16F/2). The claimant was hospitalized a few days in January 2014 due to kidney complications (*e.g.*, Exhibits 4F/59-96; 14F), but there was no evidence to justify additional functional limitations beyond those adopted above. Although progress notes have indicated that the claimant had pain in her feet and she had calcaneal spurring, she wore slippers and had no foot sores *(e.g.,* Exhibits 1F/10; 2F/126, 128; 4F/34; 5F/8; 9F/5), despite recommendation for special shoes (Exhibit 10F/6). This further indicates that the claimant's diabetes and kidney impairment are not as significant as alleged, and the limitations adopted above (including to only occasional operation of foot controls) fully addresses these impairments.

An electromyogram indicated sensorimotor polyneuropathy (Exhibit 5F/11, 15), but the limitations to lifting and/or carrying at the light level of exertion and to only occasional operation of foot controls fully addresses the claimant's diabetes. Further, despite the claimant's clinical obesity, she was able to rise and sit without difficulty (Exhibit 5F/8). The claimant complained of back pain, but it was controlled *(e.g.,* Exhibit 2F/98, 133, 211), and progress notes . . . generally indicate normal gait and station (*e.g*., Exhibits 2F; 11F; 12F/3; 19F/5; 21F/8), which does not support a limitation to sedentary work. I find that the claimant's clinical obesity (SSR 02-lp) and back pain do not justify additional functional limitations [beyond] those adopted above.

AR 27.

The ALJ clearly considered and evaluated Dr. Heslinga's opinion, but found

it was inconsistent with his own progress notes and independent clinical records.

This was not error. The Ninth Circuit has held that "a conflict between treatment

notes and a treating provider's opinions may constitute an adequate reason to

discredit the opinions of a treating physician or another treating provider."

*Ghanim*, 763 F.3d at 1161; *see also Thomas*, 278 F.3d at 957 ("The ALJ need not

accept the opinion of any physician, including a treating physician, if that opinion is

. . . inadequately supported by clinical findings."); *Batson v. Comm'r Soc. Sec.

Admin.*, 359 F.3d 1190, 1199 (9th Cir. 2004) (affirming ALJ's decision to afford

treating physicians' opinions only minimal evidentiary weight where those opinions

were in the form of checklists, were not supported by objective medical evidence,

were contradicted by other statements and assessments of the claimant's medical

condition, and were based on the claimant's subjective descriptions of pain);

*Valentine*, 574 F.3d 685, 692–93 (9th Cir. 2009) (holding that a conflict with

treatment notes is a specific and legitimate reason to reject a treating physician's

opinion); *cf. Parvon v. Colvin*, 2016 WL 1047992, at *7 (D. Haw. Mar. 11, 2016)

("[W]here the evidence may reasonably support more than one interpretation, [the

Court] may not substitute [its] judgment for that of the Commissioner. Because

[the treating physician's] treatment notes can reasonably be read not to support the

more serious findings indicated in his opinion, the Court will not disturb the ALJ's

finding on this basis.") (citation and quotation marks omitted).

Moreover, the ALJ noted that Purdy's "conservative treatment" was

inconsistent with Dr. Heslinga's opinion and did not support additional restrictions.

AR 27. "[E]vidence of 'conservative treatment' is sufficient to discount a

claimant's testimony regarding severity of an impairment." *Parra v. Astrue*, 481

F.3d 742, 750–51 (9th Cir. 2007) (citing *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995)); *see also Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) (ALJ did not err by rejecting treating doctor's recommendations as being implausible and inconsistent with the "prescribed [] conservative course of treatment," and "not supported by any findings made by any doctor," or claimant's testimony about daily activities).    Purdy's conservative treatment is, however, consistent with Dr. Heslinga's frequent observations that she had normal gait and station, intact insight and judgment, and her medical history.    AR 747, 756–58, 794, 803.    The ALJ did not err in affording little weight to Dr. Heslinga's contrary opinion regarding her disabling pain that would require her to be absent from work more than four times per month.    *See* AR 26–27.

Nor did the ALJ err in discounting Dr. Heslinga's mental functional assessment and giving greater weight to those of the State Agency specialists, including Dr. Luke.    The ALJ acknowledged that "although Dr. Heslinga is an acceptable medical source (SSR-06-03p) who may render opinions on mental impairment, Dr. Heslinga is not a mental health specialist. . . . Dr. Heslinga in fact indicated that the claimant's adjustment disorder with mixed features had improved, and it was managed with medication."    AR 24.    *See Molina*, 674 F.3d at 1112 (ALJ did not err in discounting treating source opinion that was inconsistent with that of examining psychiatrist "who specialized in the relevant field of psychiatry, and

whose opinion was therefore entitled to greater weight"); *see also Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001) ("[T]he regulations give more weight to . . . the opinions of specialists concerning matters relating to their specialty over that of nonspecialists."); *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996) (holding that the ALJ should have given greater weight to a physician with the expertise that was most relevant to the patient's allegedly disabling condition).

In short, the ALJ sufficiently justified her reliance on the medical and mental opinions of the five State Agency physicians and psychologists as "consistent with independent clinical findings or other evidence in the record." *Thomas*, 278 F.3d at 957. And in doing so, the ALJ provided the "specific and legitimate reasons" why Dr. Heslinga's opinions were entitled to less weight, despite his treating physician status. *Bayliss*, 427 F.3d at 1216.

### C.     The ALJ Properly Considered Dr. Horn's Opinion

Purdy also faults the ALJ for improperly discounting Dr. Horn's opinions regarding her mental health history and impairments. Dr. Horn "reported that from February 2012 to February 2014," Purdy had "moderate to severe major depressive disorder with significant mental functional limitations (Exhibits 6F; 7F; 20F)." AR 24. According to Dr. Horn, these limitations interfered with Purdy's activities of daily living "a lot." AR 679–88.

The ALJ gave "little weight to Dr. Horn's medical source statements, however, because they are not supported by the treatment record," including her own. AR 24, 27; *Ghanim*, 763 F.3d at 1161 (A conflict "between treatment notes and a treating provider's opinions may constitute an adequate reason to discredit the opinions of a treating physician or another treating provider."). For instance, Purdy's own disability report and the reports of several other providers demonstrated few limitations on Purdy's activities of daily living—she homeschooled her son, cooked, washed clothes, exercised, cared for her own personal hygiene, and did the grocery shopping for the family. AR 213–220; AR 42; AR 747. According to the ALJ, Dr. Horn appeared to have been reliant on Purdy's subjective complaints and "self-report" of her inability to work that were not credible, given the objective evidence of the extent of her independent functioning. AR 679; *Fair v. Bowen*, 885 F.2d 597, 602–03 (9th Cir. 1989); *Butler v. Colvin*, 2016 WL 6802477, at *12 (D. Haw. Nov. 16, 2016) ("The ALJ may discredit a treating physician's opinion that is premised solely on a claimant's own report"); *Molina*, 674 F.3d at 1113 (citing *Morgan*, 169 F.3d at 600)).

Further, while opining on Purdy's debilitated state, Dr. Horn's treatment records reflect a "normal" cognitive status. AR 295–461, 679–688, 735–851. The treatment records are consistent with the opinion of Dr. Luke. The ALJ properly relied on the findings of the consultative examining psychologist and the State

Agency medical doctors, which were based on objective clinical findings. Thus, the ALJ rejected Dr. Horn's opinion for specific and legitimate reasons supported by substantial evidence. *Hensley v. Colvin*, 600 Fed. Appx. 526, 527 (9th Cir. 2015).

Additionally, Dr. Horn's records reflect Purdy's "sporadic" treatment history, "(Exhibit 7F/2), which lessens her credibility (SSR 96-7p)." AR 24. Such a history is reflective of conditions that were neither as severe nor pervasive as those asserted by Purdy, and by Dr. Horn, in support of Purdy's benefits application.

In sum, the ALJ acted in accordance with her responsibility to determine whether the objective medical evidence supported Purdy's subjective allegations. In doing so, she gave specific, legitimate reasons for affording greater weight to particular opinions over others, and her findings were not in error.

## II.    The ALJ's RFC Finding Was Supported By Substantial Evidence

Purdy next argues that her mental health impairments "should have triggered a severity finding and appropriate limitations in the residual functional capacity determination," Opening Br. at 25, and that her "mental health problems required non-exertional mental limitations in the residual functional capacity determination," *id.* at 24. The ALJ concluded that Purdy had no severe mental impairments and therefore did not include any mental limitations in the RFC determination of light work. She found that Purdy had a non-severe adjustment disorder and included no mental limitations based upon the State Agency medical consultants' conclusions

that Purdy had "mild" restrictions on activities of daily living; "mild" difficulties maintaining social functioning and maintaining concentration, persistence and pace; and no repeated episodes of decompensation of extended duration.  AR 24.  Purdy argues that, even assuming the lack of severe mental impairment, her medical history "clearly requires some mental limitation in the residual functional capacity determination due to Plaintiff's longstanding history of mental impairment." Opening Br. at 26–27.  Her assertions fail for several reasons.

First, the ALJ, who is responsible for determining credibility, thoroughly reviewed Purdy's medical records and observed her demeanor at the hearing. According to the ALJ, the "medical evidence does not support the allegations of the claimant and her spouse that she has panic attacks, is afraid of crowds, and does not handle stress well."  AR 25.  The ALJ observed that Purdy "did not display any obvious mental or physical problems over the phone (Exhibit 1E/2), which also is some indication that her functional limitations are not as significant as alleged." AR 26.  Purdy does not challenge these uncontradicted credibility determinations on appeal.  *See also Treichler*, 775 F.3d at 1098 ("[Courts] leave it to the ALJ to determine credibility, resolve conflicts in the testimony, and resolve ambiguities in the record.") (citations omitted).

Second, although she found that Purdy had no severe mental impairments and no mental limitations were warranted, the ALJ nonetheless determined, in the alternative, that Purdy was not disabled at Step 5 even "assuming her adjustment disorder *is severe and justifies [a] mental functional limitation*[.]" AR 28 (emphasis added). That is, despite her determination that Purdy had the residual functional capacity to perform light work—except that she could only occasionally operate foot controls, climb, kneel, crouch, stoop, and balance—the ALJ also added an additional limitation of "simple, routine work" to the RFC. The ALJ inquired of the VE at the hearing whether Purdy would be able to perform past relevant work at the unskilled level, and the VE provided three alternative examples of jobs that existed in significant numbers in the national economy.[4] AR 48–49. With the

---

[4]Specifically, the ALJ recounted as follows—

> If the claimant had the residual functional capacity to perform the full range of light work, a finding of "not disabled" would be directed by Medical-Vocational Rule 202.21, but her ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations adopted above. Further, as discussed above, in this alternative, the claimant is also limited to simple routine unskilled work.

> Therefore, I also asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. The vocational expert testified that, given all of these factors, the individual would be able to perform the requirements of representative occupations such as the following:

> 1. Photocopy machine operator, DOT #207.685-014, unskilled SVP 2, light level of exertion, with 25,800 jobs in the national economy;

additional limitation of "simple, routine work" to the "light work" RFC

determination, the ALJ resolved that:

> Based on the testimony of the vocational expert, therefore, I
> conclude in the alternative that, considering the claimant's age,
> education, work experience, and residual functional capacity,
> she is also capable of making a successful adjustment to other
> work that exists in significant numbers in the national economy.
> A finding of "not disabled" is therefore also appropriate under
> the framework of Medical-Vocational Rule 202.21 (SSR 83-14)
> at Step Five.

AR 29.   Accordingly, Purdy's argument that her mental impairment—whether

severe or non-severe—required additional limitations in the residual functional

capacity determination misses the mark to the extent that the ALJ *did*, in fact,

include additional alternative limitations, including "simple routine unskilled

work."   AR 28.

Finally, insofar as Purdy asserts that the ALJ was required to include mental

limitations as part of her RFC determination, she fails to demonstrate legal error by

the ALJ.   Under Ninth Circuit precedent, the ALJ is under no obligation to include

in the RFC assessment any limitations she finds at Steps 2 and 3.   *See, e.g.*, *Bray*,

---

2.  Cleaner housekeeping, DOT #323.687-014, unskilled SVP 2, light with
    242,700 national jobs; and

3.  Operator for a power screw driver, DOT #699.685-026, unskilled SVP 2, light,
    with 63,800 national jobs.

AR 28–29.

554 F.3d at 1228–29 (finding that ALJ properly accounted for claimant's disorder in the residual functional capacity assessment and VE hypothetical, despite the fact that neither of these fully captured the severe impairment determined at Step 2); *Israel v. Astrue*, 494 Fed. Appx. 794, 796 (9th Cir. 2012) (rejecting claimant's contention that the ALJ erred by not adequately including his Step 3 findings in the RFC finding and VE hypothetical and stating, "[t]he limitations identified in step 3 . . . are *not* an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3. . . [t]he ALJ must consider the step-3 limitations along with all of the relevant evidence in the case record . . . when forming the RFC") (emphasis in original) (internal quotation marks and citations omitted); *Stubbs-Danielson v. Astrue*, 539 F.3d 1169 (9th Cir. 2008) (holding that "an ALJ's assessment of a claimant adequately captures restrictions related to concentration, persistence, or pace where the assessment is consistent with restrictions identified in the medical testimony") (citations omitted).

Here, the ALJ permissibly drew on the "mild" limitations identified in the medical opinions of the State Agency medical consultants when determining Purdy's RFC. AR 24, 28. Dr. Luke opined that Purdy was "capable of understanding and remembering simple work instructions," and of "maintaining regular job attendance and performing a simple work routine on a sustained basis under ordinary supervision." AR 518. He also found her "capable of

adapting/coping with the usual demands of a low-stress job." AR 518. As discussed previously, the ALJ permissibly accorded the mental assessments of Dr. Horn and Dr. Heslinga little or no weight, the ALJ reviewed all of the relevant evidence in the case record, and made an assessment that was consistent with the restrictions identified in the objective medical evidence. *See Israel*, 494 Fed. Appx. at 796 (citing *Stubbs-Danielson*, 539 F.3d at 1174); *see also Parvon v. Colvin*, 2016 WL 1047992, at *14 (D. Haw. Mar. 11, 2016) (finding "that the ALJ did not commit legal error in declining to include in his residual functional capacity assessment and VE hypothetical certain restrictions from steps two and three," and rejecting plaintiff's argument that "because the ALJ assessed Plaintiff's depression as 'severe' at step two, his residual functional capacity finding and VE hypothetical should have included correspondingly severe mental limitations," because "[p]er the agency's regulations and Ninth Circuit case law, the ALJ was not required to conform his residual functional capacity assessment and VE hypothetical with the limitations identified in the earlier steps"). Because the ALJ relied on the medical opinions of examining psychologist Dr. Luke and the State Agency medical consultants, and did not fail to consider all of the evidence in the record, the ALJ did not err in failing to include additional mental restrictions. *See Israel*, 494 Fed. Appx. at 796.

In short, because the RFC and hypothetical questions contained credible limitations supported by the record evidence, the ALJ did not err.

## CONCLUSION

For the foregoing reasons, the Court finds that the Commissioner's final decision applied the correct legal standards, was supported by substantial evidence, and is in accordance with the law. Accordingly, the Court affirms the July 20, 2015 decision. The Clerk of Court is directed to close the case.

IT IS SO ORDERED.

DATED: January 17, 2018 at Honolulu, Hawaiʻi.



_____
Derrick K. Watson
United States District Judge

---

*Purdy v. Berryhill*; CV 17-00071 DKW-KSC; **ORDER AFFIRMING DECISION OF ADMINISTRATIVE LAW JUDGE**